Donna Jean GOODMAN, Appellant,

v.

The STATE of Texas, Appellee.

No. 14–97–01027–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

Nov. 10, 1999.

Rob Neal, Bryan, for appellants.

Bill R. Turner, Bryan, for appellees.

Panel consists of Chief Justice MURPHY and Justices WITTIG and BAIRD.*

## OPINION

CHARLES F. BAIRD, Justice (Assigned).

Appellant was charged in a two count indictment with the offense of injury to a child. The first count alleged appellant caused serious bodily injury; the second count alleged appellant caused bodily injury. The jury acquitted appellant of the offense alleged in count one, but convicted appellant of the offense alleged in count two. The jury assessed punishment at six years confinement, probated, and a fine of $4,000.00. Appellant raises a single point of error contending the evidence is factually insufficient to sustain the verdict. We reverse.

### I. Standard of Review

We begin by establishing the standard of appellate review for resolving a factual sufficiency challenge. When we

---

* Former Judge Charles F. Baird sitting by assignment.

are asked to determine whether the evidence is *legally* sufficient to sustain a conviction, we employ the standard of *Jackson v. Virginia* and ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). However, when we determine whether the evidence is *factually* sufficient, we employ the standard announced in *Clewis v. State* and view all of the evidence without the prism of "in the light most favorable to the prosecution" and reverse only if the conviction is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. 922 S.W.2d 126, 129 (Tex.Crim. App.1996).

■ The *Clewis* standard was thoroughly discussed in *Cain v. State*, 958 S.W.2d 404 (Tex.Crim.App.1997), which stressed the three principles that must guide a court of appeals when conducting a factual sufficiency review. The first principle is deference to the jury. A court of appeals may not reverse a jury's decision simply because it disagrees with the result. Rather, the court of appeals must defer to the jury and may find the evidence factually insufficient only where necessary to prevent manifest injustice. *Id.* at 407. The second principle requires the court of appeals to provide a detailed explanation supporting its finding of factual insufficiency by clearly stating why the conviction is manifestly unjust, shocks the conscience, or clearly demonstrates bias, and the court should state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict. *Id.* at 407. The third principle requires the court of appeals to review all of the evidence. The court must consider the evidence as a whole, not viewing it in the light most favorable to either party. *Id.* at 408.

■ The *Cain* court found these principles were incorrectly applied and remanded the case to the court of appeals for a correct factual sufficiency analysis. *Id.* at 409. This was the only remedy available to the Court of Criminal Appeals because it does not have jurisdiction to review *de novo* factual decisions of courts of appeals, as the Texas Constitution confers conclusive jurisdiction on the courts of appeals to resolve questions of weight and preponderance of the evidence. *See Mireles v. State,* 994 S.W.2d 148, 149 (Tex.Crim.App.1999) (citing *Meraz v. State,* 785 S.W.2d 146, 154 (Tex.Crim.App.1990), and *Cain,* 958 S.W.2d at 408). However, the Court of Criminal Appeals does have jurisdiction to determine whether the court of appeals applied the correct standard of review and considered all of the relevant evidence. *See Cain,* 958 S.W.2d at 408.[1]

## II. Review of All of the Evidence

Pursuant to the dictates of *Cain*, we will review all of the evidence and consider it as a whole, not viewing it in the light most favorable to either party. 958 S.W.2d at 408. To ensure our compliance with *Cain*, we will summarize the testimony of each and every witness in the order they testified before the jury.

### A. The State's Case In Chief

Janet Lee was employed by the Department of Protective and Regulatory Services (hereafter CPS).[2] The CPS prepares children and prospective parents for the

---

1. For an excellent discussion of the constitutional requirement of factual sufficiency review in criminal cases, please see *Stone v. State,* 823 S.W.2d 375 (Tex.App.-Austin, 1992 pet.ref'd, untimely filed), and *White v. State,* 890 S.W.2d 131 (Tex.App.-Texarkana, 1994, pet.ref'd).

2. Sally Burris was the CPS agent originally assigned to this case. However, Burris moved out-of-state and Lee was assigned the case. Although it is not clear when Lee received this assignment, it is clear that her knowledge of this case was derived from reading the CPS file prepared by Burris and not as a result of personal involvement with the parties.

adoption. The prospective parents are required to attend the Model Approach to Partnership in Parenting (hereafter MAPP) class, which consists of an eight week, 32 hour course of training in parenting skills. Additionally, if the adoptive child has been abused or neglected, MAPP offers classes dealing with behaviors resultant from the abuse or neglect. MAPP also teaches alternatives to physical discipline.[3] Appellant and her husband, Larry Goodman, successfully completed the MAPP course. To complete the course, the Goodmans were required to sign an agreement stating they would not physically discipline the children.

Emma Johnson (hereafter the complainant), her older sister, Edna, and her brother, Danny, were available for adoption because in April of 1995, the parental rights of their natural parents had been terminated as a result of sexual abuse and neglect. In August of 1995, the three children were adopted by the Goodmans, appellant and her husband, Larry, who did not have children. At the time of the adoption, Emma was two and one-half years of age, Danny was one year of age, but Edna's age was not known to Lee.

The children were subsequently removed from the Goodman home. Edna was removed in December of 1995 or January of 1996 because she was making inappropriate physical contact with the complainant. Edna suffered from very serious emotional and behavioral problems as a result of the sexual and physical abuse from her natural parents. Therefore, Edna was removed for intensive therapy, not due to any problems with appellant. The complainant was removed from the Goodman home in February of 1996, following her admittance into the hospital. Danny was removed at approximately the same time even though he showed no signs of injury.

At approximately 3:00 p.m. on February 7, 1996, Beverly Allen was the trauma coordinator at St. Joseph's Hospital. As Allen was exiting the emergency room, she saw the complainant who was unconscious, pale and pasty-looking. The complainant was limp and being carried by appellant who was obviously upset and very concerned. Appellant stated the complainant had fallen backwards off her tricycle and hit her head. Allen took the complainant to the emergency room and assessed the complainant's respiration and breathing; she was not breathing well enough to oxygenate, which is to say she did not have sufficient oxygen going to her brain so she lost consciousness. A tube was inserted in the complainant's throat to assist her breathing. The complainant's heart rate dropped, which led Allen to provide the complainant with cardiac medication.

When the respiration and circulation improved, Allen performed a head to toe assessment of the complainant. During this assessment, Allen noticed some bruising to the right and left sides of the chest and bruising on the back of the complainant and marks on both ears. On direct examination, Allen testified to seeing red marks on the back of the complainant's head. On cross-examination, Allen described this as a red ring with no swelling or bruising, which was consistent with the complainant falling off backwards and striking the back of her head. Allen also noticed multiple marks around the neck, a bruise to the back of the head and bruises to the front of the head. Because of the latter injuries, the complainant was taken for a CAT scan and then returned to the emergency room.

Allen and Dr. Rod Nelson, the emergency room doctor, went to speak with appellant. This was routine because appellant had not been fully interviewed earlier. This conversation occurred approximately

---

**3.** Depending on the age of the child, these alternatives included "time out," redirecting the child or denial of privileges. This is done because if the child has a history of abuse or neglect, normal corporal discipline could have a different effect than on a child without such a history.

twenty-five minutes after the complainant was admitted into the emergency room. Appellant stated she tried to resuscitate the complainant after she fell off of her tricycle. Appellant also stated the complainant fell in the bathtub the night before, February 6, 1996, and hit her head. Appellant stated the complainant had fallen down along side a Blazer vehicle causing the bruising to her back the previous Sunday, February 4, 1996.[4] These explanations were made in response to Allen's questions about the injuries the complainant had sustained. The various falls mentioned by appellant were consistent with much of the injuries. For example, some of the bruising on the complainant's back was consistent with her falling from the Blazer and off her tricycle. However, some of the explanations were not consistent and appellant gave no explanation as to the marks on the side of the complainant's face and her ears. Allen testified these injuries were not common for toddlers who often had bruises on bony prominences such as their knees and shins. Allen then called the police and CPS because some of the injuries on the complainant were not consistent with the statements made by appellant. The police and CPS are required by law to be contacted whenever there are suspicious injuries.

Allen's training as a nurse included recognizing child abuse. Some symptoms of child abuse can be an inconsistency between the history given by the care giver and the injuries sustained by the child, and the various stages of bruising. Allen found bruises ranging from five days to less than six hours. Significant vaginal and rectal tears of less than twelve hours were also noted. When Allen asked appellant for an explanation of those injuries, she stated they were self inflicted as a result of the complainant's past sexual abuse.

Allen found it unusual that the complainant did not cry while receiving her medical treatment. Allen stated failure to cry was a sign of repeated abuse. Allen also said the silence could be attributed to her treatment of the complainant.[5] The complainant was taken to the intensive care unit (hereafter ICU). Through Allen, the State introduced State's exhibits 1 through 14, which were photographs depicting the complainant in the emergency room.

Allen noted there are tests to determine whether someone has a propensity to bruise more easily than others. Those are the P.T and P.P.T. tests, which were done in the course of treating the complainant. Allen testified the complainant's P.T. was 13.8 and her P.P.T. was 21.0. However, Allen was not able to quantify those results.

Allen concluded her testimony on cross-examination by stating she did not know how the injuries were sustained, nor did Allen know whether they were done by a person or by accident.

Brenda Pyburn, the third witness called by the State, was the assistant manager at the Sunset Wind Hill Apartments in Bryan where appellant lived. Appellant was residing in a downstairs apartment, which had a small cemented patio enclosed by a privacy fence.

On February 7, 1996, Pyburn was sitting in her office visiting with the apartment manager's son. Appellant entered the office and stated that her daughter had fallen off her bike and onto the patio. Appel-

---

4. On direct examination, Allen testified that appellant also stated the complainant had fallen out of her bed. However, on cross-examination, Allen testified appellant did not make such a statement.

5. Allen explained: "The way we work child abuse a lot of times is we'll have one nurse that they use to kind of confide in and be supporter of, and then there was me, that I

was sticking her with needles and doing the rape kit and kind of being the bad guy.

Q. Things that might be uncomfortable or hurt only one person did?
A. Right.
Q. Well, did she talk to the other nurse, the good cop?
A. Yes. She asked for her by name.

lant asked for someone to drive her and the complainant to the hospital. The manager's son drove appellant and the complainant to the hospital.

Pyburn had seen a tricycle at the Goodmans' apartment. Through Pyburn, the State introduced exhibits 15, 16, and 17, which were photographs of the patio area of the Goodmans' apartment.

At approximately 6:45 p.m. on February 7, 1996, Dr. Michael Marquardt, a pediatrician, was called to St. Joseph's Hospital to care for the complainant's head injury. Marquardt received his medical education at Texas A & M University and did his pediatric training at Scott and White Hospital in Temple. He was board certified in pediatrics.

The complainant was conscious and connected to a cardiac monitor. The C.T. scan showed a subdural hematoma, which is typically caused by some type of outside impact to the head.[6] Marquardt testified that a subdural hematoma can be life-threatening. He also observed a number of bruises on the head, chest, shoulders, neck, back and lower extremities. The bruises were of varying ages. The complainant also had rectal tears and vaginal tears. Marquardt also noted that the complainant was unusually quiet and had no verbal reaction to her treatment. However, Marquardt stated that it was not uncommon for children who have come from abusive homes to have behavioral problems such as speech impediments, distrust, and problems bonding. Marquardt did not have any further contact with the complainant after his treatment of her in the emergency department. Marquardt concluded that the subdural hematoma, not the other injuries, caused the unconsciousness and respiratory and circulatory problems experienced by the complainant. However, Marquardt could not set a date or time for the occurrence of the event that caused the subdural hematoma.

Marquardt questioned appellant to determine the cause of the subdural hematoma. Appellant described several impacts to the complainant's head over the preceding several days. Appellant stated the complainant fell off her tricycle and landed on her bottom and fell back and struck her head. When appellant reached the complainant, her mouth was clenched and she was not breathing. As a result, appellant grabbed the complainant on the chin. Marquardt stated this type of fall could cause unconsciousness and was consistent with appellant's explanation. However, Marquardt would not expect such a fall to cause the subdural hematoma. Marquardt based this conclusion on his experience with other children who had similar injuries, but had not had the same result. Moreover, Marquardt did not believe the bruises to the chin were recent enough to have occurred in the past two to four hours.

Appellant also described the complainant falling from the bed and falling in the bathtub. Regarding the latter, appellant told Marquardt the complainant fell and hit the front part of her head and later that same night the complainant experienced nausea that resulted in her vomiting on her pillow. Marquardt did not believe that either fall caused the subdural hematoma.

In connection with the bruises to the back, appellant stated the complainant had injured her back by striking it as she fell along the floorboard of a Blazer vehicle. However, Marquardt testified the bruises to the complainant's back did not appear to have resulted from a single event. Marquardt testified that the overall patterns and locations of the bruising were not typical for a toddler.

Marquardt was informed by CPS that the complainant had been removed from her natural parents as a result of physical and sexual abuse. He was also informed that Edna, the complainant's older sister,

---

**6.** Marquardt described a subdural hematoma as a blood collection outside the brain in the skull on the left frontal part of the complainant's head.

had been removed from the Goodman home because of her abuse to the complainant. Marquardt also had information that the complainant would sexually manipulate herself.

Marquardt testified that he had received no formal training to recognize and diagnose child abuse; it is learned through experience. Marquardt admitted he was not a forensic expert,[7] nor was he trained to give expert testimony on the cause of injuries. Nevertheless, Marquardt formed the opinion that the complainant had suffered physical abuse. However, he had no information that pointed to appellant as being the person who abused the complainant. Additionally, Marquardt testified that it was difficult to determine if the injuries were accidental or non-accidental. Marquardt further stated that the subdural hematoma could have been caused by an event not witnessed by appellant. Finally, Marquardt could not identify appellant as the person he spoke with about the injuries sustained by the complainant.

Dr. Arlene Meyer was also a pediatrician and the complainant's regular doctor. She received her medical degree from Texas A & M University. Meyer's practice was limited to pediatric clinical care; she had no training in forensic medicine. *See* footnote 6, *supra*. However, Meyer stated that throughout her pediatric residency she was continually trained in child abuse evaluation and management.

· Meyer first saw the complainant in October of 1995. At that time, appellant stated the complainant's older sister, Edna, would take the complainant from her bed and insert doll parts into her vagina. Meyer was aware that Edna had been removed from the Goodman home to receive treatment.

Meyer did not see the complainant again until February 8, 1996. When Meyer asked the complainant who hurt her, the complainant mumbled something that Meyer could not understand. Meyer then asked, "Did a lady or a man hurt you?" The complainant answered, "A lady." [8]

Meyer stated a subdural hematoma is a potentially life-threatening injury that can result in a loss of consciousness, drop in heart rate and irregular breathing. Nausea and vomiting would be symptomatic of a subdural hematoma. Meyer stated that medical records described the complainant's hematoma as small. According to Meyer, the subdural hematoma explained the complainant's condition when she arrived at the emergency room. Meyer concluded the event that caused the subdural hematoma occurred a few hours prior to the complainant's arrival at the emergency room. Meyer said it was not likely that the subdural hematoma was caused by the complainant falling from her bed or in the bathtub. Meyer was not able to state what mechanism caused the complainant's subdural hematoma, but did state that she had personally seen other subdural hematomas, but only in children who were abused.

Meyer concluded that the pattern and location of the bruises on the complainant were not consistent with normal bruising on toddlers. Meyer would not speculate as to how the bruises were caused and stated that it was not possible for any expert to know how the bruises occurred. Meyer did not speak with appellant about the injuries, but read appellant's explanations, which were contained in the medical records. Meyer did not believe appellant's explanations were consistent with the complainant's injuries. For example, the bruises to the complainant's back appeared to represent four stages of injuries, which caused Meyer to conclude the bruises were not caused by a single incident such as

---

7. Marquardt defined a forensic expert as someone "specifically trained in patterns of injury."

8. However, Meyer admitted the complainant did not say, "Mommy hurt me." Additionally, Allen testified that in connection with this conversation, it was possible the complainant was referring to Allen.

falling out of the Blazer vehicle. This conclusion was bolstered by the fact that there were no abrasions or scratches. However, one of the bruises to the complainant's back could have been sustained by falling in a bathtub.

Meyer opined that the bruise to the complainant's collarbone was the result of non-accidental trauma or child abuse. Meyer estimated the marks on the complainant's neck were five days to a week old, but admitted it was "impossible to say with great accuracy." Meyer stated some children bruised more easily than others. In this regard, Meyer stated the complainant's P.P.T. was elevated by .2, but that was not a significant elevation and would not explain the complainant's bruising. Meyer stated that while it was common for children to masturbate, she did not believe the anal and vaginal injuries were self inflicted. The complainant was discharged on February 12, 1996.

Meyer testified that appellant had brought all three of the children to see her (Meyer) on different occasions. Meyer was aware that the children had been removed from their natural parents following sexual and physical abuse.

Meyer testified that she was not saying that appellant in any way physically abused or harmed the complainant. When Meyer was specifically asked if she had any evidence, medical information, or data pursuant to her treatment of the complainant that pointed to appellant as the person who intentionally or knowingly harmed the complainant, Meyer responded in the negative. Additionally, Meyer did not see any evidence of a mechanism, such as a hand, fist, or electrical cord, that could have caused the injuries to the complainant.

At the conclusion of Meyer's testimony, the State rested.

### B. The Defense Case In Chief

Dr. Gary Randall Newsom was called as an expert witness for the defense. Following his graduation from the University of Texas Medical School, Newsom did an internship in internal medicine at Wilford Hall Medical Center in San Antonio. Newsom explained that internal medicine is the treatment of disorders in the internal organs and is a more specialized area of medicine than general practice. Newsom subsequently did a three year residency in psychiatry and trained as a flight surgeon. As a part of his education and training, Newsom worked in emergency rooms at Lackland Air Force Base and at Wilford Hall.

Upon his graduation from the training program, Newsom became a consultation psychiatrist to the emergency room. Newsom was certified in forensic psychiatry. As such, Newsom worked closely with CPS in dealing with child abuse cases. During the course of his practice, Newsom had seen many cases of child abuse, some of which resulted in fatalities, and he had been called upon to identify child abuse.

Newsom had previously testified as a witness for the State; this was his first case to testify as a defense witness. Prior to his testimony, Newsom reviewed the complainant's medical records and the photographs of the complainant, State's exhibits one through 14. Newsom also received the complainant's history from appellant. This history included a fall from the complainant's bed on Saturday, February 3, a fall out of the Blazer on Sunday evening, February 4, and a fall in the bathtub on Tuesday, February 6. According to appellant, the latter was followed by vomiting and nausea. Finally, appellant described the complainant falling from the tricycle on Wednesday, February 7. Newsom also reviewed a number of scientific studies from the Mayo Clinic, Great Britain, Australia, and the large trauma centers in the United States. These studies covered "thousands and thousands of cases" and aided Newsom in the formulation of his opinions in this case.

Newsom described a subdural hematoma as a collection of blood underneath the lining of the skull, which results from rup-

tured blood vessels. He testified that a large percentage of injuries to children, even fatal injuries, were from minor falls or household accidents. With a child the complainant's age, subdural hematomas were caused by minor falls approximately fifty percent of the time. In the cases of minor falls, forty percent of the parents did not seek medical attention for the child within twenty-four hours. Newsom explained the reason for this delay was the reaction of the child to the injury. The child may be lethargic, experience some dizziness and nausea, but not otherwise show the severity of the injury. Newsom stated that a subdural hematoma could be caused by a child falling in the bathtub.

Newsom discussed the complainant's P.T. and P.P.T. He defined the P.T. test as prothrombin time and the P.P.T. test as partial thromboplastin time. Each test describes a different clotting factor. Clotting is the function of the body that prevents bleeding. The P.T. and the P.P.T. tests determine whether a person has normal clotting. People with abnormal test results can bruise very easily, can get subdural hematomas very easily, and can experience bleeding problems.

In this case, the complainant's P.P.T. results were slightly elevated, which was abnormal for a child, and very often indicates a bleeding disorder. Such results should raise a "red flag," which should be pursued by additional testing. Newsom testified that children do not ordinarily have elevated P.T.'s or P.P.T.'s, and very often an abnormal score indicates a bleeding disorder. In Newsom's opinion, the emergency room doctors should have tested the complainant for a bleeding disorder especially in light of the bruises on the complainant. Additionally, Newsom found the complainant's liver tests showed that one of the liver enzymes, L.D.H., was grossly abnormal; such a result can indicate a bleeding disorder because the liver

produces the clotting factors. This combined with the complainant's elevated P.P.T. should have raised a "big, red flag." Despite the results of these two tests, no further testing was conducted to determine whether the complainant had a bleeding disorder. Based on the tests that were conducted, Newsom formed the opinion that the complainant had a bleeding disorder.

Newsom testified that a bleeding disorder, based upon his experience and the relevant literature on the subject, could result in the complainant bruising easily, almost immediately, and being susceptible to subdural hematomas. Newsom explained this was consistent with the complainant's subdural hematoma because the hematoma was "not of the size that one might actually see with a profound amount of trauma." Newsom stated that when children fall, fifty percent fall forward. A partial reason for this is the size of the child and the head size. Children have a tendency to fall forward because a good part of a child's body weight is the head. Additionally, Newsom testified that a subdural hematoma can be in the opposite area of the trauma. For example, trauma to the back of the head can cause the vessels in the front to rupture too. This is more common in small children because membranes inside the skull are "too lax and the brain moves around" more freely than when the person reaches the age of six. Newsom stated the complainant's subdural hematoma was consistent with her falling in the bathtub. This opinion was bolstered by the complainant's nausea and vomiting following that fall, which are symptomatic of a subdural hematoma. The small size of the subdural hematoma indicated that it was not caused by a profound amount of trauma.

Newsom also discussed his experience and current forensic literature on physicians' ability to "age and stage a bruise." [9]

9. The primary article relied upon by Newsom was published in January, 1996, entitled "Es- timation of the Age of Bruising."

According to Newsom, forensic literature is "ripe" with studies that demonstrate that "experts in the emergency room, pediatric experts and child abuse experts" are not able to determine the age of an injury.[10]

Newsom stated that children, such as the complainant, who have come from abusive homes have a two to three times greater likelihood of having significant and repeated injuries. These children who were the victims of sexual abuse at a young age had a propensity for repetitive self-injurious behavior by placing objects, usually toys, into the vagina and anus as masturbatory, self-stimulation tools. This type of self abuse was common in children the complainant's age. These children often grow to be adults who are "repeat self-harmers" who slice themselves or hurt themselves in various ways. Newsom opined that the complainant's severe sexual abuse by her father and subsequently by her sister caused the complainant to injure her vagina and anus. This is true because a child with significant emotional difficulties would be hyperactive, compulsive and a risk taker.

When viewing the photographs, Newsom stated that some of the injuries, for example the abrasion or scrape on the complainant's chin, were common for children her age. Newsom stated that State's exhibit 5, which depicted bruising to the complainant's right clavicle, could have been caused by someone lifting the complainant when she was unconscious.

When discussing State's exhibit 2 and the bruising to the complainant's back, Newsom stated the bruises were consistent with the complainant falling from a Blazer vehicle. In fact, Newsom's son had taken a similar spill that resulted in the same type of bruising. Newsom further stated whether abrasions resulted from such a fall would depend on the clothing being worn. For example, if the child wore just a shirt, there would be abra-

sions; however, if the child wore a heavier garment, such as a sweatshirt, there would not be abrasions. Newsom stated that it was almost impossible to predict the age of the bruises to the complainant's back. On this topic, Newsom concluded by stating that the complainant could have sustained the bruises to her back from a source other than child abuse.

Newsom also testified the red mark in State's exhibit 10 was consistent with a person trying to open the complainant's mouth. In connection with the remainder of the photographs, Newsom stated the bruises and injuries depicted therein were consistent with the history he obtained from appellant.

Newsom testified that had he been in the emergency room when the complainant arrived, he too would have contacted CPS. He would have done so because a physician is required by law to inform the authorities whenever there is possible child abuse. Newsom stated that physicians are very protective of children and therefore, consider it their responsibility to be suspicious. This created a "guilty until proven innocent" environment where child abuse was assumed until proven otherwise. Newsom cautioned against such assumptions and suggested that physicians should act dispassionately to determine the true cause of the injury. Accordingly, in the instant case, Newsom would have continued with further medical treatment and testing to determine the true source of the injuries rather than assuming the complainant had been abused. For example, Newsom would have followed up on the abnormal lab results to determine whether the complainant had a bleeding disorder. Newsom noted that such additional testing was crucial in this case. He also would have taken a complete skeletal X-ray of the complainant to determine whether she had any broken fingers, toes or old fractures that could be detected by a radiolo-

**10.** From these studies, the only thing the experts could agree on was the yellow colora-
tion indicated the injury may have been 18 hours or more.

gist trained at detecting child abuse. For example, Newsom explained that a broken rib on a child who was not in an automobile accident would indicate child abuse. He would also have done an organ assessment because soft organs, such as the abdomen and liver, can be injured if punched. Newsom concluded that, while child abuse was a possibility, in his opinion the complainant was not the victim of child abuse. The injuries the complainant sustained could have been accidental and could have been sustained from something other than an intentional and knowing act. Moreover, the injuries were consistent with the history appellant gave when she brought the complainant into the emergency room. Newsom concluded that appellant did not abuse the complainant and there was no information from any source that appellant committed any act that would have led to the injuries sustained by the complainant. Indeed, the injuries could have been accidental or self-inflicted.

Donna Goodman, appellant, testified that she had never before been in any type of legal trouble other than receiving a speeding ticket. She was an A and B student throughout her public education and was in Who's Who in both her high school junior and senior years. When she was eighteen, Donna married Larry Goodman. Larry was a plumber's helper who worked at Builder's Square. Donna worked as a transcriptionist in the pathology department of St. Joseph's Hospital. For seven years, Larry and Donna were unsuccessful in their attempts to have children. Because of this, Donna initiated the idea of adoption. She and Larry discussed the subject at length and decided to pursue adoption through CPS. The adoption process took approximately eighteen months and required thorough background checks into their work history and the possibility of a criminal history. For two-and-a-half months the Goodmans attended classes in the Model Approach to Partnership in Parenting (hereafter MAPP.). In MAPP, they learned of the behavioral problems of children coming from abusive homes, how they act and how to handle their behavior properly.

In the actual adoption process, CPS selects the children for the adoptive parents. Once the selection is made, a series of meetings follow. First, the adoptive parents meet with the foster parents without the children. Second, the adoptive parents meet the children. Third, the adoptive parents have an over night visit with the children. Finally, the children are placed in the home of the adoptive parents. Monthly visits by social workers follow the placement.

The two female children selected for the Goodmans were victims of sexual and physical abuse by their natural parents; the third child, Danny, was born after the two siblings were removed from their natural parents. As a part of this abuse, Edna, the older girl, was instructed to get the complainant and to abuse her sexually in front of her natural father. Unfortunately, this conduct continued with Edna sexually abusing the complainant in the Goodman home. On one occasion of abuse, Edna placed a teddy bear in the complainant's mouth to silence her crying. Edna used toys and dolls to show Donna how she (Edna) abused the complainant.

The Goodmans moved into a larger house to separate the girls. They installed a motion detector and a baby gate to keep them apart, but Edna learned how to manipulate these devices and continued to abuse the complainant. After approximately four months, Edna was taken from the Goodman home and placed in St. Theresa's Home in Dallas for treatment of sexual behavior and abuse from her natural father.

Even after Edna's removal from the Goodman home, the complainant continued the conduct. She would lay on her stomach in a prone position and rock back and forth. She would take doll arms or toys and insert them into herself. Donna removed the toys from the complainant's room except for soft-armed dolls. The

toys were removed the weekend prior to the complainant falling from her tricycle and being taken to the hospital.

Donna took the children to Meyer for their checkups. The youngest child, Danny, was an infant so he saw the doctor more often than the girls. The complainant was with Donna each time she visited Meyer and, even if it was not time for the complainant's checkup, Meyer would see the complainant. Meyer raved about the progress the children were making because their abuse had stunted their development. Meyer stated that their improvement was due to the good job Donna was doing as a parent.

When the complainant acted inappropriately, Donna would use time-out as a disciplinary method. *See* footnote 3, *supra.* She described "time-out" as talking to the complainant and sitting her in a little chair. When "time-out" was over, Donna would kneel down, remind the complainant what she had done wrong, tell the complainant that she loved her, hug and kiss her, and let the complainant out of the chair to go about her play. This type of disciplinary method was learned at MAPP. *See* n. 3, *supra.*

On Saturday, February 3, 1996, the complainant fell out of her standard twin bed, bumping her head on the dresser next to the bed and then falling to the floor. The fall resulted in a bruise to the complainant's forehead. Donna learned of the fall from the complainant who related the incident by acting out the fall with the use of a doll. Donna testified that the complainant often communicated this way because she was "speech-delayed." The complainant's motor skills were also delayed resulting in the complainant being accident prone.

At approximately 6:00 p.m., on Sunday, February 4, the complainant fell out of Donna's Blazer vehicle. This fall was recreated on videotape and admitted into evidence as Defense exhibit 1. Donna stated that the passenger door would not open from the outside. Therefore, she opened the door from the inside, pushed it open a

couple of inches, and told the complainant to stay seated while Donna walked from the driver's side to the passenger's side of the vehicle. Before Donna arrived at the passenger's side, the complainant had stepped off of the seat, her feet had slipped out from under her and she slid down, hitting her back. By the time Donna arrived, the complainant was sitting on her bottom. Her back turned red and was bruising by the time Donna got the complainant inside the house. Donna stated it was common for the complainant to bruise immediately. Donna showed the bruises to Larry. As the February weather was cool, the complainant was wearing a jacket at the time of the fall.

The following day, Monday, February 5, Donna left for work at approximately 8:00 a.m., and Larry stayed with the children, the complainant and Danny. Donna returned at 4:00 p.m.

On Tuesday, February 6, Donna left for work at approximately 7:45 a.m., and returned at 2:00 p.m. On this day, Glenda Goodman, Larry's mother, stayed with the children. At approximately 6:00 p.m., Donna was giving the complainant a bath. The complainant felt more comfortable being bathed by Donna because of the prior abuse. After turning on the water and soaping the complainant, Donna heard Danny cry. Donna left the bathroom and entered the hallway to check on Danny when she heard a loud thud. Donna returned to the bathroom and found the complainant crying and holding her forehead. Following the fall, the complainant complained of a headache and did not want to eat. She was experiencing nausea and vomited on her pillow.

Donna explained that she did not seek medical attention because the previous December Danny had fallen and hit his head on the coffee table. He immediately started vomiting so Donna rushed him to Meyer who performed a CAT scan and a check-up. Meyer diagnosed Danny as having the flu. Meyer told Donna that, as

a new mom, she had overreacted. Meyer instructed Donna that if this type of event occurred again, Donna should wait a while and observe the child rather than rushing to the doctor's office.

On Wednesday, February 7, Donna again departed for work at approximately 7:45 a.m., leaving the children with Glenda. Before leaving, Donna told Glenda of the complainant's fall in the bathtub and that the complainant had not eaten supper and that the complainant had vomited. Donna told Glenda to let the complainant eat whatever she wanted and to call Donna if the complainant got worse. Donna called two or three times throughout the day to check on the complainant.

Donna returned home at approximately 2:30 p.m., and the complainant appeared better, but still complained of a headache. Donna gave the complainant some juice and a brownie. The complainant said she wanted to go outside and ride her bike. Donna opened the patio door and let the complainant outside; Donna stayed inside with Danny and watched television. Donna did not actually see the complainant fall from the tricycle. She stated, "All I saw out of the corner of my eye was something falling. And I looked and by that time [the complainant] was already unconscious laying there on the patio. So I didn't see how she fell off, if she was standing up. I didn't see how she actually fell off the bike."

The complainant was unconscious when Donna reached her. Donna was scared and excited; she brought the complainant inside and laid her on the floor. The complainant began jerking like she was experiencing a seizure, which caused her to spit up the brownie. The complainant was also having trouble breathing. Donna worked to open the complainant's mouth by pulling on her jaw but the complainant's teeth were clenched. When Donna was not able to forcibly open the complainant's jaw, Donna began trying to breath over the complainant's nose to get her some air. When this attempt proved un-

successful, Donna picked up the complainant, who was limp, and placed the complainant on her shoulder. Holding the complainant in this position required a lot of force. Donna then scooped up Danny and ran to the apartment office where she received a ride to the hospital. This was the same hospital where Donna worked as a transcriptionist.

Upon their arrival at the hospital, Donna stated the complainant had fallen off her bike and had hit her head. After the complainant was taken for treatment, Donna spoke with Dr. Montrose and a nurse. Donna was eventually escorted to the family room by a security guard. Donna asked the guard to call two of her co-workers, Judy Hendrickson and Amy Beck. They came and tried to console Donna who was upset and crying. Beck called Larry who arrived about an hour later.

Other doctors came to question Donna. One was Dr. Briner, a neurologist, who stated the CAT scan revealed a small subdural hematoma. Briner stressed that the hematoma was so small that he had to view the CAT scan three times before discovering it. Donna was also questioned by a patrolman and later gave a recorded statement to Detective Travis Barber. Larry also gave a recorded statement and took the officers to the apartment where they took photographs of the apartment and the area where the complainant fell from her tricycle.

After approximately two hours, Donna received word that the complainant was fine and would soon be admitted to ICU. CPS workers Sally Burris and Melba Garza came, took Danny, and had him examined by an emergency room doctor who found nothing wrong. Despite there being no injuries to Danny, he was not permitted to return to Donna.

Eventually, Donna saw the complainant in ICU. The complainant was happy when she saw Donna; the complainant said "Mom" and started crying. She then held Donna's hand and said, "I'm at Mommy's

work. Do you want me to help you do your work?" and then said, "I love you." When Donna was instructed to leave, she bent down and kissed the complainant who began pulling Donna and saying, "Don't go. Don't go."

Donna described State's exhibit one as depicting the bruises to the complainant's forehead from falling from her bed and from falling in the bathtub. She stated that another State's exhibit depicted the bruises to the complainant's back from falling from the Blazer. She explained that the bruises to the complainant's jaw line were sustained while trying to help her breathe. Donna believed the bruise to the complainant's shoulder was caused when Donna was holding the complainant and trying to open her mouth and/or carrying her to the apartment office. When asked about the injuries in State's exhibits one through 14, Donna stated that she did not intentionally or knowingly do anything with any kind of instrument or her hand to harm the complainant in any way.

### C. The State's Rebuttal Case

The final witness in the trial was Barbara Rawlings, the complainant's foster parent before her adoption by appellant. The complainant was returned to Rawlings' home on February 12, 1996. Rawlings stated that while the complainant did receive scrapes, she did not bruise more than any other child. However, Rawlings testified that no testing had been performed to determine if the complainant had a bleeding disorder.

### III. Prior Decisional Authority

While countless cases have raised factual sufficiency challenges, only a handful have proven successful. Prior to conducting our analysis in this case, we will review those cases where the courts of appeals

have found the evidence factually insufficient.[11]

In *Burns v. State*, 958 S.W.2d 483 (Tex. App.-Houston [14 th Dist] 1997), the court considered a felony conviction for failure to appear. The court found the evidence legally sufficient, but held the evidence was factually insufficient to establish that the offense for which the defendant was required to appear was a felony. This holding was reached despite testimony from two witnesses that the underlying offense was a felony and the bond indicated the offense was a felony. Moreover, at trial the defendant did not contest this issue.

In describing the appropriate analysis, the *Burns* court quoted extensively from *Stone v. State*, 823 S.W.2d 375, 381 (Tex. App.-Austin 1991, pet. ref'd untimely filed). In part, the *Stone* court stated: "Because the court is not bound to view the evidence in the light most favorable to the prosecution, it may consider the testimony of defense witnesses and the existence of alternative hypotheses." *Id.*

In *White v. State*, 890 S.W.2d 131 (Tex. App.-Texarkana 1994, pet. ref'd), the defendant was convicted of possession of cocaine with the intent to deliver. The cocaine was discovered in a tackle box in a boat stored in a vacant lot next to the defendant's home. Even though the defendant was standing in the lot at the time of the search of the boat, and a search of the defendant's home resulted in the discovery of marihuana and drug paraphernalia, the evidence was factually insufficient to show that the defendant either owned or was linked to the vacant lot, the boat, or the cocaine found in the tackle box. *Id.* at 139. In reaching this holding, the court relied on *Foster v. State*, 635 S.W.2d 710, 719 (Tex.Crim.App. [Panel Op.] 1982) (opinion on reh'g), which stated the re-

---

11. In addition to these cases we are mindful of *Perkins v. State*, 940 S.W.2d 365 (Tex.App.-Waco 1997) vacated and remanded, 993 S.W.2d 116 (Tex.Crim.App.1999) and *Johnson v. State*, 978 S.W.2d 703 (Tex.App.-Corpus Christi 1998). However, those cases will not be reviewed because the Court of Criminal Appeals has either condemned the analysis, *Perkins*, or granted review of the decision, *Johnson*.

quirements for *legal* sufficiency in possession cases. 890 S.W.2d at 139.

In another case from the Texarkana Court of Appeals, *Gaffney v. State,* 940 S.W.2d 682 (Tex.App.-Texarkana 1996, pet. ref'd), the evidence was determined to be factually insufficient to support the conviction for aggravated kidnapping. The evidence was held to be so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust, even though the evidence was legally sufficient. This holding was reached despite the complainant's testimony that while he initially agreed to give the defendant a ride to a gas station, the episode lasted approximately seven hours, and the complainant was suspicious of the defendant who said he was armed. *Id.* at 684. The court again relied on decisional authority discussing the legal requirements to prove kidnapping. *Id.* at 685. In holding the evidence insufficient to establish restraint, the court stated:

> The actor in a kidnapping case must commit conduct that rises to the level of substantial restraint. This is not based solely on the conclusion of the victim, but must be viewed in light of the acts and events upon which the victim based his conclusion.

*Id.* at 686.

Finally, in *Reina v. State,* 940 S.W.2d 770 (Tex.App.-Austin 1997, pet. ref'd), the court found the evidence factually insufficient to establish convictions for either attempted murder or engaging in organized criminal activity. In *Reina,* the complainant was severely beaten and set afire by Reina's two compatriots. Despite a prior argument between Reina and the complainant, the court of appeals held the evidence did not establish either that the defendant had the intent to injure the complainant or the intent to establish a combination. *Id.* at 774–775.

## IV. Elements of the Offense and Appellant's Contentions

■ It is important to remember the jury acquitted appellant of the offense alleged in count one of the indictment, which alleged causing serious bodily injury to the complainant. Appellant was convicted of the offense alleged in the second count, which alleged bodily injury to the complainant. The elements of that offense are:

1. appellant,

2. either intentionally or knowingly,

3. caused bodily injury to the complainant,

4. a child younger than 15 years of age,

4. by inflicting blunt trauma to the face or body of the complainant,

5. by means unknown to the Grand Jury.

TEX. PENAL CODE ANN. § 22.04.

The relevant terms are statutorily defined. Intent is defined as follows: "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *See* TEX. PENAL CODE ANN. § 6.03(a). Knowledge is defined as follows:

> A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

TEX. PENAL CODE ANN. § 6.03(b). Bodily injury is defined at section 1.07(a)(8) of the Penal Code as "physical pain, illness, or any impairment of physical condition."

As we read appellant's brief, she does not contest that the complainant sustained bodily injury or that the complainant was younger than fifteen years of age. Rather, appellant contends the evidence was insufficient to show that she intentionally or *knowingly* caused bodily injury to the com-

plainant. We will discuss these contentions separately.

## V. Cause of the Injuries

■ The second principle of *Cain* requires a detailed explanation supporting a finding of factual insufficiency. 958 S.W.2d at 407. In complying with that dictate, we offer the following explanation.

First, there is no direct evidence appellant injured the complainant. Nor was there any evidence of any prior abuse of the complainant by appellant; no assaults, no beatings, or even a showing of a hostile attitude. Further, there was no evidence of any mechanism that appellant employed to injure the complainant. While Allen, Marquardt and Meyer formed the opinion that the complainant was the victim of child abuse, they offered no opinion that appellant was the person who inflicted the abuse. Specifically, Allen stated she did not know how the injuries were sustained. Marquardt testified he had no information that pointed to appellant as being the person who abused the complainant. Similarly, Meyer testified she was not saying that appellant in any way physically abused or harmed the complainant. When specifically asked if she had any evidence, medical information, or data pursuant to her treatment of the complainant that pointed to appellant as the person who injured the complainant, Meyer responded in the negative.

Second, there is evidence that appellant did not injure the complainant. Initially, we note that appellant flatly denied ever injuring or abusing the complainant. Also, appellant received extensive training through the required MAPP classes on how to properly handle the complainant's behavior. Appellant testified she used "time-out" as her sole means of disciplining the complainant and that she never resorted to physical discipline.

Third, appellant provided a history of how the complainant sustained various injuries in the days prior to her admittance to the hospital. This history was provided within twenty-five minutes of the complainant's admittance. Newsom offered his expert opinion that the complainant's injuries were consistent with the history given by appellant. Newsom concluded that appellant did not abuse the complainant and there was no information from any source that appellant committed any act that would have led to the injuries sustained by the complainant.

Fourth, there is undisputed evidence that the complainant was outside appellant's presence during several time periods, most notably when appellant was at work. On these occasions, the complainant was with either Glenda or Larry Goodman for extended periods of time. Neither Glenda, nor Larry testified to establish that they did not injure the complainant. This is significant in light of Marquardt's testimony that the subdural hematoma injury could have been caused by an event not witnessed by appellant.

Fifth, the injuries could have been self-inflicted. Newsom, a forensic psychiatrist, testified that children, such as the complainant, who come from abusive homes have a two to three times higher likelihood of having significant and repeated injuries. Additionally, such children who were the victims of sexual abuse at a young age had a propensity for repetitive self-injurious behavior by placing objects, usually toys, into the vagina and anus as masturbatory, self-stimulation tools. This type of self abuse was common in children the complainant's age because a child with significant emotional difficulties would be hyperactive, compulsive, and a risk taker. Newsom opined that the complainant's severe sexual abuse by her father and subsequently by her sister caused the complainant to injure herself. Newsom's opinion is bolstered by the undisputed fact that the complainant was physically and sexually abused by her natural parents and her older sister, and appellant's statements to Allen that the injuries were self-

inflicted as a result of the complainant's past sexual abuse.

These five reasons greatly outweigh any evidence in support of the verdict and, therefore, we conclude the instant conviction is manifestly unjust.

We are mindful that we may not reverse a jury's decision simply because we disagree with the result; we must be deferential to the jury's verdict. *Cain*, 958 S.W.2d at 407. In that vein, we recognize that the jury was free to disbelieve appellant's testimony, *Gaffney*, 940 S.W.2d at 685. However, we note that appellant had no prior criminal history or prior bad acts to affect her credibility. Moreover, even if the jury chose to disbelieve appellant, such disbelief cannot provide substantive proof that appellant caused the injuries. *See Johnson v. State*, 673 S.W.2d 190, 196 (Tex.Crim.App.1984), and cases cited therein; *Reina*, 940 S.W.2d at 774; *Miranda v. State*, 813 S.W.2d 724, 735 (Tex. App.-San Antonio 1991, pet. ref'd). Nor may a jury resort to speculation to reach a verdict. *See Reese v. State*, 653 S.W.2d 550, 553 (Tex.App.—Beaumont 1983, no pet).

Based upon our *de novo* review of the record evidence, fully taking into account the three principles of *Cain*, we find that the evidence when not viewed in the light most favorable to the prosecution is factually insufficient to prove appellant injured the complainant. In light of this finding, we hold the jury's verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust and that this holding is necessary to prevent manifest injustice. *See Clewis*, 922 S.W.2d at 129; *Cain*, 958 S.W.2d at 407.

## VI. Intentional or Knowing Conduct

■ Having found the evidence factually insufficient to establish appellant caused the injuries to the complainant, we need not address the remaining contentions.

However, we will do so out of an abundance of caution.

We offer the following detailed explanation in support of our finding that the evidence is factually insufficient to establish that the injuries were caused by an intentional or knowing act of another. First, there is no direct evidence of an intentional or knowing injury to the complainant. Second, Allen testified the injuries could have been the result of an accident. Third, Marquardt testified that it was difficult to determine if the injuries were accidental or non-accidental.

Fourth, Meyer testified she did not see any evidence of a mechanism, such as a hand, fist or electrical cord that could have caused the injuries to the complainant. We find this factually significant because an intentional or knowing injury could not have been inflicted without the use of some mechanism.[12]

Fifth, Newsom formed the opinion that the complainant was not the victim of child abuse and that the injuries she sustained could have been sustained from something other than an intentional and knowing act. Indeed, according to Newsom, the injuries could have been accidental, which was consistent with appellant's history of the falls experienced by the complainant in the days preceding her admittance into the hospital.

Sixth, as noted earlier, we cannot overlook the possibility, given the unique circumstances of this case, that if the injuries were intentionally or knowingly inflicted, they were done so by the complainant whose speech and motor skills were delayed or stunted, which explains her being accident prone.

These six reasons greatly outweigh any evidence in support of the verdict and, therefore, the instant conviction is manifestly unjust.

---

12. At this juncture, we pause to note that the State did not call a grand juror or make any effort to establish the investigation the Grand

Jury undertook, if any, to determine the means by which the bodily injury was caused.

While we are again mindful that we must be deferential to the jury's verdict, *Cain,* 958 S.W.2d at 407, we cannot ignore the record evidence, which is overwhelming and contrary to that verdict.

Based upon our *de novo* review of the record evidence, fully taking into account the three principles of *Cain,* we find that the evidence when not viewed in the light most favorable to the prosecution is factually insufficient to prove the complainant was injured as the result of an intentional or knowing act. In light of this finding, we hold the jury's verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust and that this holding is necessary to prevent manifest injustice. *See Clewis,* 922 S.W.2d at 129; *Cain,* 958 S.W.2d at 407.

## VII. Conclusion

We are authorized under the factual conclusivity clause of Article V, Section 6 of the Texas Constitution to determine *de novo* whether the record evidence is factually sufficient. Following the three principles of *Cain v. State,* 958 S.W.2d at 407, we find the evidence is factually insufficient to establish that appellant injured the complainant and we further find the evidence factually insufficient to establish that the injuries sustained by the complainant were intentionally or knowingly inflicted by another. Consequently, we hold the instant conviction is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis v. State,* 922 S.W.2d at 129. Accordingly, we reverse the judgment of the trial court and remand this case to that court for further proceedings.