

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-22-00017-CR

_____

MICHAEL TAREZE EVANS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 8th District Court
Hopkins County, Texas
Trial Court No. 2128749

Before Morriss, C.J., Stevens and van Cleef, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

After a jury found Michael Tareze Evans guilty of aggravated assault with a deadly weapon, he was sentenced to sixty years' confinement in prison.[1] Evans appeals, maintaining first that the evidence was legally insufficient to support his conviction and second that the trial court erred when it allowed the State, allegedly, to expand its theory of liability beyond the allegations contained in the indictment, denying him due process of law and opening him up to the possibility of double jeopardy. Because we find that (1) the evidence was legally sufficient to support the jury's verdict of guilt and (2) there was no material variance between the indictment and the proof, we affirm the judgment of the trial court.

At trial, the jury heard a recording of a 9-1-1 call that had been made at the time of the incident at issue. In that call, the jurors heard Evans's girlfriend, Elisha Hamilton, tell the 9-1-1 operator that she was in her vehicle very near the Sulphur Springs police station. In short order, Hamilton can be heard screaming, and then frantically saying, "I got somebody chasing me and hitting me in my backend."[2] After telling the operator that the person was chasing her, she stated, "Please have someone sitting out there waiting on me, please, or I can't get out of the car." The 9-1-1 operator notified officers, telling them that the caller stated that she was being chased by someone in a large SUV and that he kept "rear-ending her." Hamilton also explained to the 9-1-1 operator that she had been hiding from her ex-boyfriend, who was later identified as

---

[1]Evans's sentence was enhanced by a prior 2012 Arkansas felony conviction of simultaneous possession of drugs and firearms.

[2]The 9-1-1 operator, Heather Haywood, testified that she heard Hamilton "scream or yelp when the vehicle struck the other vehicle."

2

Evans, but that he had apparently located her. When the operator asked her for her boyfriend's name, Hamilton stated that she did not want to provide the requested information because she did not want to cause any "trouble." Hamilton said that she just wanted the officers to tell Evans to "leave her alone." The operator responded, "I don't think that's going to happen." Hamilton then explained to the operator that she was currently driving behind the police station and that Evans was still following her. Hamilton continued driving near the police station until police officers arrived and detained Evans.

In the early morning hours of July 16, 2021, Sulphur Springs police officer Joshua Shufeldt received a dispatch call about a suspect rearending a woman's vehicle. Dispatch advised Shufeldt that the woman was trying to get away from the suspect. Shufeldt responded to the scene, as did two additional officers. When Shufeldt contacted Hamilton, she "appeared to be shaking, crying. She needed a cigarette immediately. She seemed stressed."

In addition, the State published a recording from a nearby outdoor security camera, showing Evans following Hamilton at, what appeared to be, an excessive rate of speed and in very close proximity to her vehicle. According to Shufeldt, Evans had been operating his vehicle in a manner that could have caused Hamilton serious bodily injury or death.

As a result of Evans's actions, the trunk of Hamilton's vehicle had been "smashed in," and there were "indentations and cracks inside the bumper." In addition, the trunk of her vehicle would not close properly. According to Shufeldt, the damage was consistent with a vehicle that

3

had been rearended by another vehicle.[3]   Shufeldt was asked if "the ramming, rear-ending, hitting, whatever you call it, had happened in Hopkins County?"  Shufeldt responded, "Yes, sir."

Hamilton testified that she had been in an argument with Evans the morning of the incident and that she had left her place of employment because she did not want Evans to cause a scene.  But, on her way back to work, Hamilton saw Evans in his SUV at a four-way stop. Hamilton said that Evans began "follow[ing], chas[ing]" her.  In an effort to lose Evans, Hamilton stated that she ran through some stop signs and that, at "the last minute[, she] decided to slam on [her] brakes."  As a result, according to Hamilton, Evans "connected" with or "tapped" the back of her vehicle.  Hamilton stated that, because it had "been a while" since the incident occurred, she was not certain, but she believed, that Evans hit the rear of her car once as opposed to twice.  She also explained that she had been having trouble with her brake lights.  She continued, "[W]ho's to say they were working before the incident or not."

In addition, Hamilton testified that she was not only running to get away from Evans, but that she had "a lot of stuff in [her] life at the time.  It wasn't just [their] situation."  And, despite the contents of the 9-1-1 phone call, Hamilton said that she was not scared during the incident and that she just wanted to return to work so that she could finish her shift.  Hamilton conceded that she still loved Evans and that she wanted him back in her life so that together they could raise their child.

Hamilton also admitted that Evans made a telephone call to her while he was in jail awaiting trial, during which he stated, "I did it to myself, I've got to face the consequences," and

---

[3]The State offered, and the trial court admitted, photographs of the damage to Hamilton's vehicle.

"I'm going to take them to trial, because I know they're going to try to contact you, and you won't tell them anything."[4]  In regard to the latter comment by Evans, Hamilton stated, "The thing is, there's nothing to tell."  Despite that, when she was asked whether she told the officers the truth at the scene, Hamilton responded, "Yes."

Hamilton also agreed that she had not seen eye-to-eye with the prosecutor and that her interactions with him in his office had not gone well.  Likewise, Hamilton said that it was fair to say that she never mentioned to the 9-1-1 operator or to the responding officers that she had "brake-checked" Evans's vehicle.  According to Hamilton, she did not know she was required to go into great detail about the incident nor did she "think that it would ever [get] this far."  Hamilton said that she only wanted the officers to tell Evans to leave her alone and that, "from the get-go," she did not want the State to prosecute him.

*(1)*     *The Evidence Was Legally Sufficient to Support the Jury's Verdict of Guilt*

Evans contends that there was legally insufficient evidence to support the jury's guilty verdict.  According to Evans, the State alleged that he threatened Hamilton with imminent bodily injury by "ramming" her vehicle, but it produced no evidence in support of a "ramming."  We disagree.

In evaluating legal sufficiency of the evidence, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt.  *Brooks v. State*, 323

---

[4]The recording of Evans's call to Hamilton was admitted into evidence and published to the jury.  During the call, Evans stated, among other things, "Those drugs did something to me," and "It gets to a point where I can't even control myself."  Evans also stated, "It made me madder," to which Hamilton responded, "Because you had threatened me already."  The record reflects that Evans contacted Hamilton frequently while he was in jail, including the day of trial.

5

S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

In our review, we consider "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Hooper*, 214 S.W.3d at 13 (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)). It is not required that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* "Circumstantial and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13 (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004))). Further, "we must consider all of the evidence admitted at trial, even if that evidence was improperly admitted." *Fowler v. State*, 517 S.W.3d 167, 176 (Tex. App.—Texarkana 2017), *rev'd in part by* 544 S.W.3d 844 (Tex. Crim. App. 2018) (citing *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004)).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "The "hypothetically correct" jury charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

In drawing reasonable inferences, the jury "may use common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life." *Duren v. State*, 87 S.W.3d 719, 724 (Tex. App.—Texarkana 2002, pet. struck) (citing *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring)). The jury is also the sole judge of the credibility of the witnesses and the weight to be given their testimony and may "believe all of [the] witnesses' testimony, portions of it, or none of it." *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014). We give "almost complete deference to a jury's decision when that decision is based on an evaluation of credibility." *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008)).

The State's indictment against Evans alleged that, on or about July 16, 2021, he "intentionally or knowingly threaten[ed] ELISHA KAYE HAMILTON with imminent bodily injury by ramming a motor vehicle into a motor vehicle ELISHA KAYE HAMILTON was driving, and [Evans] did then and there use or exhibit a deadly weapon, to-wit: a motor vehicle,

7

during the commission of said assault."[5]  *See* TEX. PENAL CODE ANN. § 22.01(a)(2), § 22.02(a)(2) (Supp).

The gist of an assaultive offense is that the defendant "acts with intent to cause a reasonable apprehension of imminent bodily injury." *Dobbins v. State*, 228 S.W.3d 761, 766 (Tex. App.—Houston [14th Dist.] 2007, pet. dism'd) (citing *Garrett v. State*, 619 S.W.2d 172, 174 (Tex. Crim. App. 1981)).  Consequently, we look at the "acts and culpability of the defendant's behavior, that is, whether the defendant intended to cause or knowingly 'caused in the victim a reasonable apprehension of imminent bodily injury.'" *In re S.B.*, 117 S.W.3d 443, 450 (Tex. App.—Fort Worth 2003, no pet.) (quoting *Edwards v. State*, 57 S.W.3d 677, 680 (Tex. App.—Beaumont 2001, pet. ref'd)).  The statute does not require actual perception of the threat by the victim.  TEX. PENAL CODE ANN. § 22.01(a)(2).  Yet, the Texas Court of Criminal Appeals has concluded that a perception of "some threat of imminent bodily injury," coupled with the use of a deadly weapon, supports a conviction for aggravated assault.  *See Olivas v. State*, 203 S.W.3d 341, 350 (Tex. Crim. App. 2006).  A person may communicate a threat by conduct as well as words.  *McGowan v. State*, 664 S.W.2d 355, 357 (Tex. Crim. App. 1984).

Specifically, Evans contends that it was not enough for the State to show that he followed Hamilton too closely and inadvertently hit her car.  Evans points out that there was evidence that

---

[5]A deadly weapon is anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.  TEX. PENAL CODE ANN. § 1.07(a)(17)(B).  An item that is not a deadly weapon, per se, may be deemed a deadly weapon by reason of its use or intended use.  *Hill v. State*, 913 S.W.2d 581, 582–83 (Tex. Crim. App. 1996).  A motor vehicle may be a deadly weapon where "the vehicle was intentionally, recklessly or negligently used as a weapon by the accused."  *English v. State*, 828 S.W.2d 33, 38 (Tex. App.—Tyler 1991, pet. ref'd).  A deadly-weapon finding is justified if a rational jury could have concluded that the defendant's vehicle posed an actual danger of death or serious bodily injury.  Here, Evans does not contest the jury's finding that his vehicle amounted to a deadly weapon.

8

Hamilton caused the collision by "brake checking" Evans's vehicle, that is, evidence that Hamilton, not Evans, caused the collision. While Hamilton testified at trial that she slammed on her brakes, forcing Evans's vehicle to "connect" or "tap" the rear of her vehicle, there was also evidence that he "rammed" the rear of her vehicle, thereby placing her in fear of imminent bodily injury.

In real time, an emotionally charged Hamilton detailed Evans's actions to the 9-1-1 operator. The evidence showed that Evans and Hamilton had an ongoing disagreement the day of the incident and that she was attempting to "hide" from him. According to Hamilton, Evans was aware that she did not want to speak with him about their issues until after she had completed her shift at work. Despite having that knowledge, Evans intentionally followed too closely behind Hamilton's vehicle and exceeded the speed limit, ramming or colliding into the back of Hamilton's vehicle. There was also testimony that the damage to Hamilton's vehicle was consistent with a vehicle that had been rearended by another vehicle. Photographs of Hamilton's vehicle showed significant damage—enough damage for a reasonable jury to determine that Evans "rammed" into Hamilton's vehicle.[6]

In addition, Hamilton frantically explained to the 9-1-1 operator that an individual, whom Hamilton later identified as Evans, was "chasing [her] and hitting [her] in [her] backend."

---

[6]Evans maintained that there was no evidence of him "ramming" into Hamilton's vehicle. To the extent that he contends that the word "ram" was never used to describe the incident between his vehicle and Hamilton's vehicle, that argument fails. Merriam-Webster's online thesaurus states that synonyms for "ram" include, but are not limited to, the following: bang, bash, bump, collide, crash, hit, impact, knock, slam, smash, strike, swipe, and thud. MERRIAM-WEBSTER, THESAURUS, *Ram*, https://www.merriam-webster.com/thesaurus/ram.

Although the statute does not require actual perception of the threat by the victim,[7] when the jury heard Hamilton's impassioned plea to the 9-1-1 operator, asking for officers to be waiting for her before she exited her vehicle, and when it heard evidence of Hamilton's panicky scream during the call, the jury could have reasonably determined that Evans's actions, including rearending her vehicle, placed Hamilton in fear of imminent bodily injury. It is not controlling that Hamilton's testimony at trial differed from the statements she gave to the 9-1-1 operator on the day of the incident. As always, the jury was required to fairly resolve any conflicts in testimony, and it was within its discretion to believe all, part, or none of Hamilton's testimony and of the evidence in general. *See Thomas*, 444 S.W.3d at 10.

Because we find that there was sufficient evidence to support the jury's verdict of guilt, we overrule Evans's evidentiary challenge.

*(2)      There Was No Material Variance Between the Indictment and the Proof*

Evans also contends that, by allowing the State to prove something other than "ramming," the trial court permitted the State to expand its theory of liability beyond that alleged in the indictment, also affecting his right to be free from double jeopardy and denying him his due process rights. We disagree.

Evans essentially asserts that there was a material variance between the indictment that alleged a "ramming" of Hamilton's vehicle by Evans's vehicle and some other characterization of how the two vehicles came together as contained in the evidence. A "variance" is a discrepancy between what the indictment alleges and what is proven at trial. *Byrd v. State*, 336

---

[7]*See* TEX. PENAL CODE ANN. § 22.01(a)(2).

10

S.W.3d 242, 246 (Tex. Crim. App. 2011); *Gollihar v. State*, 46 S.W.3d 243, 246 (Tex. Crim. App. 2001). A material variance is one that prejudices a defendant's substantial rights and will render the evidence insufficient. *Ramjattansingh v. State*, 548 S.W.3d 540, 547 (Tex. Crim. App. 2018). But this situation does not present a variance, much less a material variance. Evans urges a hyper-technical meaning for the word "rammed" by arguing that the evidence did not prove the State's allegation, we gather, because the evidence failed to include the word "rammed" or failed to include evidence of a certain type of collision but proved only that there was a different sort of collision or other contact between the two vehicles, Hamilton's in front, Evans's in back.

As we discussed above, there was sufficient evidence to support the jury's finding that Evans's actions, which included hitting Hamilton's vehicle from the rear with his vehicle, caused Hamilton to be in fear of imminent bodily injury. Consequently, there was no variance, whether material or immaterial, between the State's indictment and the proof presented by the State at trial.

Having overruled both of Evans's points of error, we affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted:     July 7, 2022
Date Decided:      August 17, 2022

Do Not Publish

11