# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00786-CR

**Tommy Dean Brown, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 27TH JUDICIAL DISTRICT
### NO. 53,033, HONORABLE C. W. DUNCAN, JR., JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Tommy Dean Brown of intentionally or knowingly causing serious bodily injury to a child. *See* Tex. Pen. Code Ann. § 22.04(a), (e) (West 2003). On appeal, appellant contends that his conviction should be reversed and a new trial granted because there was factually insufficient evidence to support his conviction. We will affirm the judgment of the district court.

## BACKGROUND

Appellant and Shannon Lambert met while both were stationed at Fort Hood. The two began living together and became engaged. During the early afternoon hours of November 17, 2001, Lambert decided that she would go grocery shopping at the commissary on the grounds of the

base.  Appellant informed her that he would remain at home with their twenty-five-day-old son, Dameon.  Lambert left the residence at approximately 1:00 p.m.  According to Lambert's testimony at trial, she noticed nothing unusual about Dameon or his physical condition when she returned at approximately 3:00 p.m.  When, after a couple of hours, Lambert decided to wake and feed the baby, she noticed a small bruise under his eye.  According to Lambert, appellant had been Dameon's sole caretaker while she was gone and the bruise was not there when she left for the commissary.  She testified that appellant told her that he had given the baby a bath and had put the baby to sleep in his bassinet and did not know what had caused the bruise.

At approximately 7:00 p.m., Dameon began to cry.  Lambert went to feed him and change his diaper.  While changing the diaper, Lambert noticed various light red and purple bruises that were just beginning to form on Dameon's chest and stomach.  Again Lambert asked appellant what had caused the bruises, and he again gave no explanation.  Lambert decided that they should take Dameon to the hospital to ensure that he had no threatening medical condition.  When they arrived at the Darnell Army Community Hospital, Lambert stated to personnel that she believed that Dameon was having an allergic reaction or had a rash.  However, after medical examination, medical personnel determined that Dameon had experienced some sort of nonaccidental trauma.

The hospital doctors called social services and authorities.  Lambert informed them that whatever had happened to Dameon must have happened to him while he was under appellant's care.  Lambert also told the social service authorities that appellant had been angry at Dameon the night before because he cried and did not sleep through the night.  She described how appellant got out of bed and took the baby to the living room because Lambert delayed in getting up to care for

2

him. When appellant returned to the bedroom, he punched a large hole in the closet door. Lambert also testified that appellant had a problem with mood-anger control and that his treatment included medication and a previous hospital stay in Darnell's mental ward for mood-anger control problems.

Brian Cummins, a special agent with the U.S. Army criminal investigation command, testified that he had conducted the investigation concerning the injuries to Dameon. During the course of his investigation, Agent Cummins took a sworn written statement from appellant and conducted a videotaped interview of appellant. The statement was admitted into evidence and read to the jury. In relevant parts, appellant stated that after Lambert went to the commissary, he changed the baby's diaper and that the smell made him "puke." He later gave the child a bath, during which the baby "kept whining" and "smelled really bad." Appellant stated that he rubbed the baby's legs especially hard during the bath because of the smell. When appellant put the baby on the changing table, the top shelf broke and the baby rolled and hit a wooden ledge. Appellant then picked the child up and cradled him, which made the baby more comfortable. When appellant walked into the living room, he stubbed his toe on a rocking chair, which made him "more mad." Appellant's statement goes on to read, "I took him to the living room, grabbed him by . . . his mid-back, and threw him in the bassinet. When I threw him, he landed on his front side, his . . . head hit and he bounced back." Appellant also stated that he threw the baby into the bassinet "pretty hard" and that he spanked Dameon on his buttocks because appellant was "just upset."

Agent Cummins later took another statement from appellant, which was videotaped to record appellant's nonverbal actions. The videotape was entered into evidence and shown to the jury. During the second statement, appellant recounted the events of November 17, 2001 to Agent

3

Cummins, relating all of the details based on a "scale of anger." Appellant stated that his anger continuously rose during the time that Lambert was at the commissary. He stated that he "beat [the baby] on the bottom . . . about ten times," which "left bruises on him." Appellant admitted in his statement that he had hit Dameon "probably a little too hard." He also told Agent Cummins that he had taken the baby's hand and used it to hit the baby around the right eye, about "six or seven times."

Appellant then stated that he decided to give the baby a bath, which further increased his anger because it "took [him] around 15, 20 minutes to do." After the bath, appellant carried the baby to the changing table, and when the shelf on the table broke and the baby continued to cry, appellant stated that he became furious. According to appellant, "That was my breaking point. I hit my ten." Upon further questioning, appellant admitted that he "proceeded to bop [the baby] into the closet door . . . mak[ing] kind of a bunk sound." Appellant stated that Dameon eventually stopped crying. Appellant believed that at that point the baby must have been thinking, "[H]oly f-----g s--t, I think Dad just gave me a major f-----g concussion." Appellant also believed that he "almost killed [Dameon's] ass." At the conclusion of the second statement, appellant said that he had taken his anger medication and that had he not, he "would have probably put [the baby] through the closet door . . . or . . . would have picked up the closet door, set him on the floor and beat him to death."

The jury also heard the testimony of two doctors who treated Dameon. Dr. Michael Luszczak testified that the baby suffered from ecchymosis, a medical term for bruising or bleeding under the skin, and that the injuries were consistent with the injuries that would be sustained by an unrestrained passenger in a high speed vehicle crash. Dr. David Ray Hardy testified that the injuries were consistent with a fall from a second story floor. He also testified that, in his medical opinion,

4

the child will remain severely impaired: "He will never be able to walk. I do not expect him to be able to gain any language. He will probably have to have surgery to place a tube into his belly so he can be fed, and . . . I suspect that these injuries will eventually shorten his life and precipitate his death."

The jury returned a verdict of guilty and imposed a sentence of sixty years and a fine of $10,000. On appeal, appellant argues that the evidence is factually insufficient to support the verdict.

## DISCUSSION

If the defendant challenges the factual sufficiency of a finding of guilt on appeal, the reviewing court must determine whether: (1) the evidence is so weak as to make the verdict manifestly unjust, and (2) the finding of a vital fact is so contrary to the weight and preponderance of the evidence as to be clearly wrong. *See Zuliani v. State*, 97 S.W.3d 589, 593 (Tex. Crim. App. 2003); *Goodman v. State*, 66 S.W.3d 283, 285 (Tex. Crim. App. 2001). In reviewing the factual sufficiency of the evidence, we view the evidence in a neutral light favoring neither party. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). In reviewing evidence, the trier of fact has the responsibility of weighing all evidence, resolving all conflicts, and drawing reasonable conclusions from the evidence. *Garcia v. State*, 57 S.W.3d 436, 441 (Tex. Crim. App. 2001). Furthermore, a decision is not manifestly unjust simply because the trier of fact resolved conflicting views of the evidence in the State's favor. *Roise v. State*, 7 S.W.3d 225, 233 (Tex. App.—Austin 1999, pet. ref'd).

5

Appellant contends that the evidence is factually insufficient to support the jury's finding of guilt because the evidence does not clearly identify him as the *only* individual with the opportunity to have caused the injuries to Dameon. Although it is true that appellant was not the only person with the *opportunity* to cause Dameon's injuries, appellant admitted to beating Dameon and he never sought to contradict the State's evidence that his actions caused the injuries. Nor did appellant present any evidence tending to suggest to the jury that another person inflicted the injuries on Dameon.[1] Based on Lambert's testimony that Dameon was in good health when she went to the commissary, the jury could have reasonably believed that she did not cause her son's injuries. Thus, after examining all of the evidence, including appellant's own two statements in which he admitted that he had injured and even "beat" Dameon, we conclude that the evidence of guilt is neither so weak nor so outweighed by contrary evidence as to render the guilty verdict manifestly unjust. The finding that appellant was the person who inflicted the injuries on the child is not so contrary to the weight and preponderance of the evidence as to be clearly wrong. *See Zuliani*, 97 S.W.3d at 593. The jury weighed all the evidence, resolved all the conflicts, and drew reasonable conclusions from the evidence. *See Garcia*, 57 S.W.3d at 441. We overrule appellant's sole point of error.

---

[1] Appellant's defense at trial consisted of cross-examination of the State's witnesses and a closing argument. During cross-examinations, counsel elicited testimony that appellant was excited about the baby, that Lambert was not concerned about leaving the child in appellant's care, and that some of the bruises had not been accounted for in appellant's two statements to Agent Cummins. In his closing argument, counsel argued that, at most, appellant's conduct was reckless and not intentional or knowing.

## CONCLUSION

Because we find that the evidence factually supports the finding of guilt, we affirm the judgment of the district court.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed:   July 11, 2003

Do Not Publish

7