In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-08-00146-CR


______________________________




DARRELL JENKINS, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 195th Judicial District Court


 Dallas County, Texas


Trial Court No. F07-51595-QN




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Chief Justice Morriss



MEMORANDUM OPINION



 Jose Landa's birthday celebration ended tragically around midnight near a Dallas (1) automatic
teller machine, when he was killed by an armed robber's bullet. The group celebrating Landa's
birthday included his wife, his wife's sister, and the sister's boyfriend. The group left a bar on Cedar
Springs Road shortly before midnight, and Landa went to a nearby ATM and withdrew some money. 
As Landa rejoined his friends and wife, a person described as a tall black man with a bandanna partly
covering his face, "high cheek bones," and a "really tight" thing on his hair appeared, pointed a gun
at Landa, and demanded "everything you have." When the robber grabbed for Landa's necklaces,
Landa reached for him and was shot dead. The assailant turned and ran, joining three other men,
who all ran away.

 In the aftermath of the shooting, Darrell Jenkins was arrested, charged, tried, and convicted,
at jury trial, of capital murder. From a sentence of life imprisonment, Jenkins appeals, arguing only
that the evidence is factually insufficient to support his conviction. Finding the evidence factually
sufficient, we affirm the judgment of the trial court.

 In a factual sufficiency review, we review all the evidence, but do so in a neutral light and
determine whether the evidence supporting the verdict is so weak or is so outweighed by the great
weight and preponderance of the evidence that the jury's verdict is clearly wrong or manifestly
unjust. Lancon v. State, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008); Roberts v. State, 220 S.W.3d
521, 524 (Tex. Crim. App. 2007); Clewis v. State, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996). 
In this review, we are to afford "due deference" to a jury's determinations. Marshall v. State, 210
S.W.3d 618, 625 (Tex. Crim. App. 2006). Even if contradictory witness testimony may be
compelling, the jury is the sole judge of what weight to give to such testimony. Lancon, 253 S.W.3d
at 705. We are to afford "almost complete deference to a jury's decision when that decision is based
upon an evaluation of credibility." Id. (citing Marshall, 210 S.W.3d at 625). "Although an appellate
court reviewing factual sufficiency has the ability to second-guess the jury to a limited degree, the
review should still be deferential, with a high level of skepticism about the jury's verdict required
before a reversal can occur." Roberts, 220 S.W.3d 524.

 The standard of factual review to be applied on appeal is the same regardless of whether the
State uses direct or circumstantial evidence. King v. State, 895 S.W.2d 701, 703 (Tex. Crim. App.
1995); McGoldrick v. State, 682 S.W.2d 573, 577 (Tex. Crim. App. 1985). A person's identity can
be proved by either direct or circumstantial evidence. Earls v. State, 707 S.W.2d 82, 85 (Tex. Crim.
App. 1986).

 The evidence in this case is conflicting and not without flaws. With the exception of the
victim, his family, police, and two passersby, other witnesses were identified by at least two
names--their real names and street names--had police records, and were admittedly drug users or
male prostitutes. It appears that several may have been gang members. To say that their testimony
was not entirely consistent is an understatement. 

 Jenkins argues that the record does not support his conviction because there is no physical
evidence linking him and the crime; because a major witness for the State, Rodney Butler, cannot
be believed; because the descriptions of the robber's physical characteristics do not support the
State's case; because a "jailhouse confession" is questionable; and because the record, therefore,
shows the existence of an alternative reasonable hypothesis.

 While the record contains no physical evidence such as fingerprints, ballistics tests, or DNA
reports to prove guilt, the absence of such evidence does not prevent the State from proving its case. 
In this case, the State presented evidence that Jenkins admitted to a cellmate that he had committed
the murder; that he had a gun the night of the murder; that he was in the immediate area about ten
minutes before the murder; (2) that he ran away; that he was involved in discussions with other
individuals about the way a robbery was mishandled; and that, when an individual in the house in
which he was hiding wanted to open the door to police, Jenkins warned that everyone in the house
would be killed if he got caught.

 In evidence is the police interview of Butler in which he stated he saw Jenkins pointing a gun
at Landa's head. Jenkins points out that Butler recanted those interview statements on the witness
stand and suggests that his story is thus unbelievable. Butler had first denied knowledge of the
murder, then had set out details of the offense when Detective Randy Loboda interviewed him, and
finally had recanted those details when he testified at trial.

 Butler testified that he had simply followed Loboda's lead during the interview and provided
the information he thought Loboda wanted. Butler explained that he thought he had been named as
the shooter rather than Jenkins and that he was just trying to protect himself in identifying Jenkins
as the shooter. In the interview, however, Butler did not simply agree with Loboda's statements or
leading questions. The interview was directed, but that is not the whole story. Many critical bits of
information were not provided by Loboda, but were filled in by Butler as the interview progressed
and as he explained how Butler was not involved in the shooting.

 The State also introduced testimony about a "jailhouse confession" in which Jenkins had told
a cellmate that he had killed a man near an ATM and that the only thing he got was two gold
necklaces. Counsel correctly points out that the evidence shows that one of the necklaces was silver. 
That discrepancy, however, does not require the remainder of the testimony to be disregarded. 

 There are also discrepancies in the testimony about how the four people in Jenkins' group
fled, whether together or separately. Similarly, the described height of the shooter was inconsistent. 
Most of the evidence was that he was about the height of Landa (the tallest of the four people in the
victim group) at about six feet, while Jenkins is about six feet, three inches tall. These are
discrepancies in testimony; as such, the weight of such testimony is for the jury to determine.

 Even if contradictory witness testimony is compelling (and the contradictory testimony here
is not), the jury is the sole judge of what weight to give to such testimony. Lancon, 253 S.W.3d at 
705. We are required to afford "almost complete deference to a jury's decision when that decision
is based upon an evaluation of credibility." Id. (citing Marshall, 210 S.W.3d at 625). This is a
classic situation in which the credibility of the witnesses is the paramount determination of the jury.

 Here, the proof is not so weak that it must be disregarded; and, despite counsel's able
argument about the lack of believability of certain witnesses, we find no troop of unassailable Boy
Scouts establishing a theory contrary to the picture painted by the assertedly incredible witnesses for
the State. See Goodman v. State, 66 S.W.3d 283, 285 (Tex. Crim. App. 2001).

 The evidence is factually sufficient to support the verdict.

 We affirm the judgment.



 Josh R. Morriss, III

 Chief Justice


Date Submitted: March 16, 2009

Date Decided: March 17, 2009


Do Not Publish
1. This case was transferred to this Court from the Fifth District Court of Appeals in Dallas as
part of the Texas Supreme Court's docket equalization program. We are not aware of any conflict
between the precedent of the Dallas Court and the precedent of this Court on any issue relevant in
this appeal. See Tex. R. App. P. 41.3.
2. Jenkins was identified by his ex-lover, Mitchell Polk, who volunteered his suspicions to
police, essentially that he was sure the actors had to be the men he had seen ten minutes earlier.



me="Light Grid Accent 3"/>
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 












 
 
 
 
 
 
 




 

 

 

 

 

 

 

 

 

                                                         In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-09-00240-CR

                                                ______________________________

 

 

                         QUINCY WELLINGTON JACKSON,
Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                       On Appeal from the 188th
Judicial District Court

                                                             Gregg County, Texas

                                                          Trial Court
No. 37,054-A

 

                                                       
                                           

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                              Memorandum Opinion by Justice Carter








                                                     MEMORANDUM 
OPINION

 

            After
a guilty plea, Quincy Wellington Jackson was convicted of robbery and sentenced
to forty years imprisonment.[1]  Prior to his plea, a jury found that Jackson
was competent to stand trial.  Jacksons
sole point of error on appeal argues that evidence to support the jurys
verdict at the competency hearing was factually insufficient.  We affirm the trial courts judgment.  

            A
competency hearing is civil in nature, so we apply the civil test and weigh all
the evidence to determine if the jury finding was so against the great weight
and preponderance of the evidence as to be manifestly unjust.  Parker
v. State, 667 S.W.2d 185, 187 (Tex. App.Texarkana 1983, pet. refd)
(citing Ex parte Watson, 606 S.W.2d
902 (Tex. Crim. App. 1980)).  Because an
accused is presumed competent to stand trial, a defendant must prove by a
preponderance of the evidence that he or she does not have sufficient present
ability to consult with his or her attorney with a reasonable degree of
rational understanding, or that the defendant does not have a rational as
well as factual understanding of the proceedings against the person.  Tex.
Code Crim. Proc. Ann. art. 46B.003 (Vernon 2006); see also Meraz v. State, 785 S.W.2d 146, 15455 (Tex. Crim. App.
1990); Parker, 667 S.W.2d at 187.  Because the jury is the sole judge of the
credibility of the witnesses at the competency hearing, and weight given to
their testimony, it may accept or reject all or any of a witness
testimony.  Parker, 667 S.W.2d at 187; Wesbrook
v. State, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000).  

            The
evidence presented at trial was conflicting.  Psychiatrist Frank Stewart Murphy interviewed
Jackson for two hours.  He noticed that
Jackson had speech latency, he took a long time to answer questions, and did
not demonstrate an understanding of the criminal charges against him.  Although he didnt witness any interactions
between [Jackson] and his defense counsel, it did not appear to Murphy that
Jackson was usefully helping his attorneys defend him.  Murphy found that Jackson was not competent
to stand trial.  He concluded Jackson
suffered severe mental illness in the form of personality disorder, but
revealed his belief that Jackson may have been exaggerating some of his
symptoms.   

            This
exaggeration was noted by another expert witness.  Psychologist Thomas Allen testified Jackson
could not understand the purpose of the examination and limits of
confidentiality during the initial interview. 
Allen described Jackson as a reluctant historian during the one hour
and fifteen minute examination, leading to the conclusion that cooperation was
an issue, a trait not typically seen in people exhibiting mental illness.  Whereas persons with mental illnesses would
respond in some fashion, Jackson could not interact in even a minimal sense.  Allen couldnt get him to subtract 3 from
100, . . . [or] count to 5.[2]
 This prompted Allen to question jailer
Daryl McClinton, who had a lot of contact with Jackson and said, No, he
doesnt act that way.  I talk to him all
the time.  He interacts with other
inmates.  He plays basketball.  After this conversation raising inconsistency
of behavior in an exam against behavior outside of that exam, Allen became
convinced that Jackson was feigning his symptoms.  He testified [i]t appeared to me that he was
trying to convey an image of someone who suffered from schizophrenia.  So he was giving me his ideas of what he
thought that looked like.  Allen found
Jackson competent to stand trial.  

            Jailers
and others interacting with Jackson did not see reason for Murphys
concerns.  McClinton clarified for the
jury that Jackson would follow his commands and could carry on conversations about
God, about his past experience in prison, and would read and discuss scripture
without evidence of any speech latency. 
From June 2008, Jackson would report to Scott Finley of the Texas
Department of Criminal Justice parole division every month.  Finley testified that Jackson was able to
understand interview questions and could respond adequately.  He did not witness any speech latency and
described Jacksons responses as rapid fire. 
Finley visited with Jackson the day before trial and handed him forms,
one of which Jackson refused to sign because my attorney told me not to.  Jail supervisor, Deputy Clifford Powell,
witnessed an argument Jackson had with a jailer, described his words as rapid
fire, testified that he did not witness any speech impediment, and stated that
Jackson could follow his directions. 
Jailers December Gray and Reagan Revellette also testified Jackson would
comply with their commands and could carry on a normal conversation with them
and with others without delay. 

            Although
Jackson was capable of logical conversation, his wife, Sara Armstrong, testified
he would continuously repeat[] himself during jailhouse visits and acted as
if he did not fully comprehend their conversations.  The jury later heard several telephone
conversations Jackson had with her which confirmed the suspicion that Jacksons
presentation to the examiners was greatly exaggerated.  On the telephone, Jackson showed a remarkable
ability to speak clearly at an accelerated pace.  He carried on fairly intelligent
conversations, did not repeat himself, asked typical questions of Armstrong,
gave her advice, and was able to express his emotions and situation
clearly.  He discussed his desire to
obtain medical and prison records and inquired as to whether his wife had
contacted his parole officer.  The telephone
conversations did not reveal characteristics that would support Murphys
evaluation.  The difference was so marked
that a reasonable juror could have concluded that his appearance before the
medical examiners was concocted to give the appearance of incompetency.  

            While
Murphy only spoke with Jackson, Allen also interviewed McClinton, whose
statements about Jacksons demeanor and understanding were confirmed by other
jailers.  The jury could determine Allens
assessment, which considered Jacksons behavior outside of a competency
interview, proved more accurate.  Finleys
testimony regarding Jacksons ability to follow counsels instructions in
refusing to sign certain documents indicated he could have sufficient present
ability to consult with his attorney with a reasonable degree of rational
understanding.  Tex. Code Crim. Proc. Ann. art. 46B.003.  The jury, as sole judges of credibility, could
have rationally formulated a conclusion that Jackson was malingering,
especially after reviewing Jacksons telephone conversations with
Armstrong.  This type of behavior could
justify a finding that Jackson had a rational as well as factual understanding
of the proceedings against the person. 
Because Jackson was presumed competent to stand trial unless he proved
otherwise, we find the evidence factually sufficient to support the jurys
determination.  Jacksons sole point of
error is overruled.  

            We
affirm the trial courts judgment. 

 

 

                                                                        Jack
Carter

                                                                        Justice

 

Date Submitted:          August
26, 2010

Date Decided:             September
2, 2010

 

Do Not Publish











[1]Originally appealed to the Twelfth Court of Appeals,
this case was transferred to this Court by the Texas Supreme Court pursuant to
its docket equalization efforts.  See Tex.
Govt Code Ann. § 73.001 (Vernon 2005). 
We are unaware of any conflict between precedent of the Twelfth Court of
Appeals and that of this Court on any relevant issue.  See
Tex. R. App. P. 41.3.

 





[2]Allen
clarified that Jacksons interactions with arresting and interviewing
officers, certainly didnt speak to mental retardation; didnt speak to
psychotic thought disorder, either.